UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| LARRY W. JELSMA, | ) | CIV. 09-4010-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING |
| vs. | ) | DEFENDANT'S MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| CITY OF SIOUX FALLS, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Larry Jelsma, filed suit against defendant, City of Sioux Falls, for alleged violations of the Americans with Disabilities Act, the Age Discrimination in Employment Act, and the Family Medical Leave Act. The City moves for summary judgment on all claims. The motion is denied.

## BACKGROUND

The facts, taken in the light most favorable to Jelsma, the nonmoving party, are as follows:

In 1989, Jelsma began working for the City as a park service worker. He changed positions in 1997 when he became the building maintenance worker at the water plant. Bruce Anderson and Randy Janssen supervised Jelsma from 2005 until his retirement in 2007.

Beginning in 2000, Jelsma began experiencing problems with his left shoulder, but continued to work without any accommodation. In 2005, Jelsma further injured his shoulder when he fell against a handrail at work, tearing his

rotator cuff. Jelsma informed the City about this injury on March 23, 2006, when he filed a worker's compensation claim.

Jelsma consulted with Dr. Kalo about his shoulder. Dr. Kalo restricted Jelsma's work activities to not lifting more than ten pounds above chest level and no climbing with his left arm. Dr. Kalo also suggested a change in job and shoulder replacement surgery. Jelsma later saw Dr. Braman, who rejected the shoulder replacement option and instead recommended that Jelsma's rotator cuff be repaired. Jelsma estimated that his condition affected less than 5 percent of his work and that he was substantially performing his job duties.

The City provided light duty for Jelsma. After a May 11, 2006, meeting with Anderson and Janssen, Anderson prepared a list of nine job duties that Jelsma could not perform: no climbing on ladders; no lifting over ten pounds with his left shoulder over chest height; no carrying a ladder if both arms were needed; no tree trimming; no raking, shoveling, or mopping; no floor scrubbers or buffers; no self-propelled hand mowers; no roof climbing; and limitations on his left arm's mobility.

In 2006 and 2007, Jelsma's supervisors held numerous meetings about his ability to continue working. Jelsma underwent an independent medical examination by Dr. Luther. Dr. Luther found Dr. Kalo's restrictions on Jelsma's work activities to be too limiting. In replacing Dr. Kalo's restrictions, Dr. Luther found that Jelsma could not climb ladders, should limit certain shoulder

maneuvers to an occasional basis of less than one-third of the day, and needed

to keep his shoulder close to his body. Additionally, Dr. Luther stated that

Jelsma could lift objects weighing less than twenty pounds with his left arm,

instead of the ten-pound limitation imposed by Dr. Kalo. Docket 31-10 at 1.

After the meetings and the various doctors' reports, the City informed

Jelsma that it would only provide light duty to Jelsma through his retirement

eligibility date if Jelsma wanted to apply for retirement. On February 12, 2007,

Jelsma reached age 60 and was eligible for early retirement benefits under the

City's defined benefit pension plan.

On February 20, 2007, Jelsma met with his supervisors and informed

them that he would be having shoulder surgery that summer and would need

FMLA leave to recuperate and to care for his ill mother. The City had granted

Jelsma FMLA leave to care for his mother in the past. On February 23, 2007,

he told Bill O'Toole, who was with the City's human resources department, that

his surgery was scheduled for March 21, 2007. Jelsma again informed his

supervisors that he would be having surgery on March 21, 2007, in a

February 28, 2007, meeting.

Beginning with the February 23, 2007, meeting between Jelsma and

O'Toole, the City began pressuring Jelsma to retire. On or around February 27,

2007, Jelsma met with Janssen and Anderson and they encouraged him to

retire. On March 1, 2007, and March 5, 2007, Jelsma and his supervisors

discussed his possible physical limitations after his shoulder surgery. Jelsma alleges that on or around March 5, 2007, Janssen told Jelsma that if he did not retire, Janssen could terminate his employment. Jelsma claims that his supervisors threatened him that if he was terminated by the City, he would lose both his health and pension benefits. On March 8, 2007, Jelsma met with O'Toole, who encouraged him to retire. Jelsma filled out the retirement application during this meeting. Even though Jelsma was eligible for early retirement at age 60, if he had waited until age 65 to retire, his pension plan payments and social security benefits would have been greater than if he retired at age 60. Additionally, Jelsma had to pay $2,621.32 more per year for health and dental insurance than he would have if he had remained employed at the City.

Jelsma had partial shoulder replacement surgery on March 21, 2007. His arm was in a sling for eight weeks. Three months after the surgery, Jelsma could perform light tasks with his left shoulder. Six months after the surgery, Dr. Braman generally found that Jelsma could not return to full duty at the City, but never listed which specific tasks Jelsma could or could not perform. While Jelsma had informed the City earlier of his need to take FMLA leave, he did not formally apply for FMLA leave until April 10, 2007. The City approved his April 10, 2007, request. He began receiving retirement benefits in April

2007. After Jelsma retired, the city eliminated his job position. The City

assigned other, younger workers to absorb Jelsma's job duties.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Only

disputes over facts that might affect the outcome of the case will preclude

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is not appropriate if a dispute about a material fact is

genuine, that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient

evidence to establish that there are no genuine issues of material fact and that

the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). On a summary judgment motion, the court views the

facts, and inferences drawn from those facts, " 'in the light most favorable to

the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 586 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S.

654, 655 (1962)).

The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). Evidence based on inferences is acceptable in an employment discrimination case. *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). Because the court is especially deferential to plaintiffs who base their evidence on inferences, "summary judgment should seldom be used in employment-discrimination cases." *Id.* (citing *Johnson v. Minn. Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991); *Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir. 1987)).

**ANALYSIS**

**I.    Americans with Disabilities Act**

A plaintiff can prove a discrimination claim under the Americans with Disabilities Act ("ADA") with either direct or indirect evidence. *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir. 1998). Jelsma does not allege direct evidence, but rather relies on indirect evidence. Employees can use the *McDonnell Douglas* burden-shifting analysis to establish a prima facie case of discrimination based on indirect evidence under the ADA. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).

To make out a prima facie case of discrimination under the ADA, an employee must make three showings: (1) that he has a disability as defined in

the Act; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) he has suffered an adverse employment action because of his disability. *Cravens v. Blue Cross & Blue Shield*, 214 F.3d 1011, 1016 (8th Cir. 2000). If the plaintiff makes this showing, the burden shifts to the defendant to rebut this presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Young*, 152 F.3d at 1021. If the defendant makes this showing, the burden shifts back to the plaintiff to show that the defendant's proffered reasons are merely pretext for discrimination. *Id.*

## A. Disability Under the ADA

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2005).[1] Under Section A, a person has an actual disability if "he has (1) a physical or mental impairment that (2) substantially limits one or more major life activities of the individual." *Christensen v. Titan Distrib., Inc.*, 481 F.3d 1085, 1094 (8th Cir. 2007) (internal

---

[1] Section 12102, defining "disability," was amended effective January 1, 2009, by the ADA Amendments Act of 2008. This court applies the version of § 12102 that was in effect at the time Jelsma retired. *See Ladd v. Mohawk Carpet Distrib., L.P.*, No. 08-6470, 2010 WL 2541651, at *9 n.3 (D. Minn. Apr. 1, 2010) ("Although the Eighth Circuit has yet to consider the ADA Amendments Act, other circuit courts have consistently ruled that it is not retroactive." (citations omitted)).

quotation omitted). The Equal Employment Opportunity Commission ("EEOC")

has issued regulations defining the ADA's elements of disability. The EEOC

defines physical impairment as any physiological disorder or condition affecting

one or more of the body systems such as the neurological, musculoskeletal,

special sense organs, respiratory, or cardiovascular systems. EEOC, ADA Equal

Employment Reg., 29 C.F.R. § 1630.2(h)(1) (1991); *see also Otting v. J.C.*

*Penney Co.*, 223 F.3d 704, 708 (8th Cir. 2000).

A substantial limitation on major life activities occurs with tasks that are

"central to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196

(2002), *superseded, in part, by statute*, ADA Amendments Act of 2008, Pub. L.

No. 110-325, 122 Stat. 3553. Major life activities are the basic functions that

an average person in the general population performs. *Snow v. Ridgeview Med.*

*Ctr.*, 128 F.3d 1201, 1207 (8th Cir. 1997). Such activities include caring for

oneself, seeing, hearing, speaking, sitting, standing, breathing, lifting, and

reaching. *Wenzel v. Mo.-Am. Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005);

*Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 616 (8th Cir. 1997).

No ADA violation exists if the individual is unable to perform one

particular job, rather the individual must be unable to perform "an entire class

or broad range of jobs." *Snow*, 128 F.3d at 1207. The court looks at three

factors to determine if a person cannot perform an entire class of jobs: (1) the

number and type of jobs from which the person is disqualified; (2) the

geographical area where the individual would have access to other jobs; and (3) the individual's job training, experience, and expectations. *Helfter*, 115 F.3d at 618.

Jelsma has shown that he had a physical impairment at the time he retired because the injury to his left shoulder affected his musculoskeletal system. He never alleged, however, that his impairment prevented him from accomplishing major life activities such as walking, lifting, or reaching. It appears that he was able to walk, care for himself, and complete a number of tasks at work. Jelsma estimated that his shoulder injury only affected 5 percent of his duties at the City. A 5 percent reduction in work activities is not a substantial limitation on major life activities.

Jelsma further failed to allege sufficient facts under *Helfter.* Jelsma holds college degrees in horticulture and botany, has employment experience as a building estimator, homebuilder, bookkeeper, and has taken computer courses. He alleged no facts that he would be unable to perform any class of job within the relevant geographical area.

Jelsma can also make out a claim under the ADA if he can show that there is a record of a physical impairment or that the City regarded him as having an impairment. 42 U.S.C. §§ 12102(2)(B), (C). Jelsma advanced no evidence showing that a record of his physical impairment exists. Thus, he

must show that the City regarded him as disabled to defeat summary judgment.

"Regarded as" disabled is mutually exclusive from being actually disabled. *Wenzel,* 404 F.3d at 1041. "Regarded as" disabled occurs when "(1) the employer mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or (2) the employer mistakenly believes that an *actual* impairment substantially limits one or more major life activity." *Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 988-89 (8th Cir. 2007) (citing *Wenzel*, 404 F.3d at 1041).

"In order to be regarded as disabled with respect to the major life activity of working, the employer must mistakenly believe that the actual impairment substantially limits the employee's ability to work." *Id.* at 989. A substantial limitation occurs "only when the employee is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.' " *Id.* (quoting *Conant v. City of Hibbing*, 271 F.3d 782, 784-85 (8th Cir. 2001) (per curiam)). Thus, "[i]f an employer mistakenly believes that an employee is unable to perform a *class of jobs or a broad range of jobs,* then the employer regards the employee as disabled." *Christensen*, 481 F.3d at 1093 (emphasis added). But "if an employer only mistakenly believes the employee is unable to perform a *single job*, then the employer does not regard the employee as disabled." *Id.* (emphasis added).

Jelsma's doctor originally only prohibited Jelsma from lifting objects weighing more than ten pounds and climbing with his left arm. The City later placed nine limitations on Jelsma's work after a May 11, 2006, meeting with Janssen and Anderson. The City found Jelsma to be more disabled than his doctor found.

In 2006 and 2007, Janssen, Anderson, and O'Toole met numerous times to determine if Jelsma could continue working. They never discussed what Jelsma would be able to do after the surgery, but rather based their discussions on his current physical abilities as described in the report by Dr. Luther. Docket 25, Ex. 8 (discussing only Jelsma's retirement as a solution at a February 8, 2006, meeting); Docket 25, Ex. 13 (listing a number of positions at a February 8, 2007, meeting and stating, "Larry is not qualified for these positions."). Because Jelsma's supervisors summarily dismissed his ability to perform any of the City's vacant positions, a jury could find that the City regarded Jelsma as disabled and mistakenly believed that his impairment substantially limited his ability to perform a broad range of jobs.

**B.  Qualified to Perform Essential Functions**

To satisfy the second element of the prima facie test, Jelsma must first show that he "meets the necessary prerequisites for the job, such as education, experience, and training," and second, that he "can perform the essential job functions, with or without reasonable accommodation." *Hatchett v. Philander*

*Smith Coll.*, 251 F.3d 670, 674 (8th Cir. 2001) (citing *Land v. Wash. Cnty.,*

*Minn.*, 243 F.3d 1093, 1095 (8th Cir. 2001)). "The ADA is broad in its scope,

but it only protects individuals who can perform their job." *Browning v. Liberty*

*Mut. Ins. Co.*, 178 F.3d 1043, 1048 (8th Cir. 1999). Jelsma can satisfy the first

prong by virtue of having previously held the position. *See id.* With respect to

the second prong, the essential functions of a job include the fundamental job

duties, but not the marginal functions of the position. *Moritz v. Frontier Airlines,*

*Inc.*, 147 F.3d 784, 787 (8th Cir. 1998) (citing EEOC, ADA Equal Employment

Reg., 29 C.F.R. § 1630.2(n)(1) (1991)).

The employer must first identify the fundamental job duties. *Chalfant*,

475 F.3d at 990. Evidence used to identify job duties includes: (1) the

employer's judgment as to which functions are essential; (2) written job

descriptions; (3) the amount of time the employee spends performing the

function; (4) the consequences of not requiring the employee to perform the

duty; and (5) the work experience of other employees in similar jobs. *Id.*

(summarizing 29 C.F.R. § 1630.2(n)(3)). An employer's judgment on the

essential functions of a job is highly probative. *Alexander v. Northland Inn*, 321

F.3d 723, 727 (8th Cir. 2003). After the employer meets its initial burden, the

employee presents evidence that he is qualified for the position. *Chalfant*, 475

F.3d at 990.

The City had a job description for a building maintenance worker, Jelsma's position, that specified fifteen tasks and the frequency of each task, meaning the percentage of the day an employee spends doing that task. Docket 18-5. Cleaning the structural components of the building, such as the floors, windows, walls, etc., had the highest frequency at 20 percent. Three other major job duties, at 10 percent frequency each, included caring for the lawns and flower beds, performing minor maintenance, and operating power-equipped cleaning equipment. The other 50 percent of the job duties had a frequency of 5 percent each and included cleaning restrooms, removing snow and ice, emptying wastebaskets and ashtrays, removing litter, replacing light bulbs and polishing metal work, securing municipal buildings, painting walls, directing employees to clean buildings, monitoring boilers, and preparing for public activities in City buildings. The City presented sufficient evidence of the general essential job functions of a building maintenance worker.

Jelsma has the burden of proving that, with or without reasonable accommodation, he could perform the essential functions of the job at the time he retired. *See Browning*, 178 F.3d at 1048. Jelsma stated that his shoulder injury affected 5 percent of his duties. He particularly had problems lifting more than ten pounds above his chest with his left hand and climbing ladders. But otherwise he could perform the majority of his job duties. Dr. Kalo, Jelsma's physician, stated that Jelsma should not lift more than ten pounds

above his chest level and no climbing with his left arm, but otherwise he should be able to continue most of his job functions. Docket 38-1. The City is entitled to rely and act upon written advice from the plaintiff's physician that unambiguously and permanently restricts him from certain activities. *See Alexander*, 321 F.3d at 727. While Jelsma could not climb fixed wall ladders, he was able to climb extension ladders, where he only had to use three limbs because the ladder was at an angle. Jelsma was not able to climb scaffolding or lift certain weights above his head. But Jelsma testified these tasks were less than 5 percent of his duties and those tasks were also included in the written job duties of and routinely performed by his co-workers.

The City further argues that Jelsma could only do light tasks three months after surgery and would not have been able to return to his job at the City for a minimum of six months. Any claims by the City of Jelsma's ability to perform essential duties, however, must be based on his performance at the time of his resignation. *See Browning*, 178 F.3d at 1048.

In determining whether an employee may be able to perform the essential job duties, the ADA provides that it must be considered whether the essential duties can be performed with a reasonable accommodation. *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999). Before the employer makes accommodations, it must have actual knowledge of the impairment. *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995). The City had

knowledge of Jelsma's impairment because it received Dr. Kalo's restrictions list and then assigned Jelsma to light duty.

Jelsma has the burden to show that one or more reasonable accommodations existed that would have allowed him to perform the essential functions of his job. *Buckles*, 176 F.3d at 1101. While there is no precise test, a reasonable accommodation will not "cause other employees to work harder, longer, or be deprived of opportunities." *Rehrs v. Iams Co.*, 486 F.3d 353, 357 (8th Cir. 2007) (citation omitted). Reasonable accommodations include a broad array of options such as making existing facilities more accessible, restructuring jobs, part-time or modified schedules, and modifying equipment. 42 U.S.C. § 12111(9). Notably, reassignment to a vacant position may be necessary as a reasonable accommodation. *Cravens*, 214 F.3d at 1018.

In determining which accommodations are reasonable, employers should engage in an interactive process with the employee. 20 C.F.R. § 1630.2(o)(3). While there is no per se liability under the ADA if the employer fails to engage in an interactive process, when a person with a disability requests an accommodation, the employer should initiate an informal interactive process. *Id.*; *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999). The interactive process requires that the employer and employee act in good faith, analyze the job duties and the employee's specific limitations, and then identify potential accommodations. *Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723,

727 (8th Cir. 1999). On a summary judgment motion, the failure of an employer to engage in the interactive process is prima facie evidence that the employer may have been acting in bad faith. *Fjellestad*, 188 F.3d at 952.

At the time of his resignation, Jelsma must have been able to perform his job with or without reasonable accommodations. *Browning*, 178 F.3d at 1048. Jelsma submitted his resignation on March 8, 2007. As of March 2007, before his March 21, 2007, surgery, the City restructured Jelsma's job so that he performed his job duties with an accommodation of light duty.

Jelsma presented the City with a note from Dr. Kalo suggesting some accommodations. Later, on its own initiative, the City further restricted Jelsma's duties. It did not confer with Jelsma or any of his doctors before limiting his duties. A jury could find that the City did not engage in a good faith, informal interactive process with Jelsma to determine appropriate accommodations for him.

The City also never consulted with Jelsma about a transfer to another department, but rather decided that he was not qualified for the City's vacant positions. This conclusion lacked any analysis as to why Jelsma was not qualified for these positions. Both job restructuring and reassignment to a different job are considered reasonable accommodations. 42 U.S.C. § 12111(a). Viewing the evidence in the light most favorable to Jelsma, there are sufficient facts in the record to show that Jelsma was qualified to perform the essential

functions of his position with a reasonable accommodation when he submitted his resignation.

## C. Adverse Employment Action

Jelsma must show that an adverse employment action occurred and that there existed "a 'specific link' between the discrimination and the adverse action to prove that the discrimination motivated the adverse action." *Chalfant*, 475 F.3d at 991 (citing *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005)). "In other words, the disability must be a motivating factor in the employer's decision for the adverse action." *Id.*; *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 97-98 (2003) (holding that "motivating factor" is the standard in an employment discrimination case).

An adverse employment action is a "material employment disadvantage." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (internal quotation omitted). "The law defining adverse employment actions is fact intensive." *Shockency v. Ramsey Cnty.*, 493 F.3d 941, 950 (8th Cir. 2007). Traditional examples of adverse employment actions include termination, reduction in pay or benefits, or significant changes that affect an employee's future career prospects. *Spears v. Mo. Dep't of Corr.*, 210 F.3d 850, 853 (8th Cir. 2000).

An adverse employment action can also include constructive termination. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1008 n.13 (8th Cir. 2000). To prevail on a constructive termination claim, an employee must show: (1) that a

reasonable person would have found the working conditions intolerable; and (2) that the employer either intended to force him to resign or could have reasonably foreseen that he would resign as a result of its actions. *Id.* The employee's resignation must be objectively reasonable. *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 753-54 (8th Cir. 2000). An employee must not assume the worse or jump to conclusions too quickly. *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998).

Jelsma did not suffer a traditional adverse employment action. Rather, he alleges that the City forced him into retirement, i.e., the City constructively terminated him. He alleges that his supervisors told him that if he did not retire, he would be terminated, and that his supervisors continually pressured him to retire instead of continuing to offer him accommodations or transferring him to a vacant position. He contends that he was threatened with a loss of pension benefits and medical benefits if he did not retire and was terminated. Jelsma argues that he would not have resigned but for the pressure from his supervisors and the threat of termination.

The City relies on *Fischer v. Andersen Corp.*, 483 F.3d 553 (8th Cir. 2007), to support its argument that threats of termination are insufficient to prove a constructive termination claim. Docket 37 at 12. In *Fischer*, the employee knew that he would be receiving discipline, a performance improvement plan ("PIP"), for his performance issues at work. *Fischer*, 483 F.3d

at 555. He had heard a rumor from another worker that if he offered to retire, he could avoid a PIP. *Id.* At the discipline meeting, the employee offered to retire and the employer decided not to impose a PIP. *Id.* After the employee continued to perform poorly, the employer placed the employee on a PIP. *Id.* At this second discipline meeting, the employee asked if he could avoid the PIP by giving a retirement date, and the employer indicated that the performance and potential retirement issues were completely separate. *Id.* Fischer testified that he offered to retire so that he could keep his current medical benefits, which were changing for all employees the next year. *Id.* at 557.

This case differs from *Fischer*. Here, according to Jelsma, he was being urged by his supervisors to retire and was being threatened with termination and a loss of benefits if he did not retire. Fischer, on the other hand, was only facing being placed on a PIP. Furthermore, by resigning, Fischer was able to keep his current medical benefits, which were better than the medical benefits being offered to retained employees for the next year. Contrastingly, Jelsma would have received better benefits had he continued working for the City until age 65. Unlike the plaintiff in *Fischer*, a reasonable person in Jelsma's situation could believe that the City was forcing him to resign and that his working conditions were intolerable.

The City argues that no one ever told Jelsma that he would be terminated if he did not retire and no one ever pressured him into retiring.

Rather, City officials offered to continue providing Jelsma with light duty work until he was eligible to retire so that Jelsma did not suffer a loss of income. For summary judgment purposes, the court must view the evidence in the light most favorable to Jelsma. Viewed in that light, there is sufficient evidence to find that Jelsma was constructively discharged. As a result, Jelsma has made a prima facie case of ADA discrimination.

### D. Nondiscriminatory Reasons for the Employment Action

Under the *McDonnell Douglas* burden-shifting analysis, if an employee makes out a prima facie case of ADA discrimination, a rebuttable presumption of discrimination arises. *Young*, 152 F.3d at 1021. The employer then has the burden to prove it had a nondiscriminatory reason for the adverse employment action. *Id.* If the employer advances a nondiscriminatory reason, the burden shifts back to the employee to prove "that the employer's proffered reason is merely a pretext for intentional discrimination." *Id.* To survive summary judgment, the employee must: "(1) present evidence creating a fact issue as to whether the employer's proffered reasons are pretextual; and (2) present evidence that supports a reasonable inference of unlawful discrimination." *Id.* at 1023 (citing *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996)).

An employer must give an honest explanation of its behavior in an ADA discrimination case. *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir.

1994). While the situation is fact intensive, the court does not "sit as a 'super-personnel department' with the power to second-guess employers' business decisions." *Russell v. TG Mo. Corp.*, 340 F.3d 735, 746 (8th Cir. 2003) (citing *Harvey*, 38 F.3d at 973).

The City argues that its nondiscriminatory reason for urging Jelsma to retire was that the City could not offer the light duty accommodations indefinitely. The City further states that no pretext existed for its reasons for urging Jelsma to retire. It even offered to continue the modifications until he was eligible to retire so he would have no lapse in income.

Assuming that these reasons are honest, Jelsma can defeat the nondiscriminatory reasons by showing pretext. *Young*, 152 F.3d at 1021. Jelsma argues that the City limited him too much in his duties. For example, the City prohibited him from working on rooftops, even when he did not need to use a ladder; performing electrical work, a major job duty; and repairing light fixtures. If Jelsma shows that the City unnecessarily limited his duties, a jury could find that the City's reasons that it advanced to justify the constructive discharge were pretext.

Pretext alone will not preclude summary judgment; rather, the employee must present evidence that creates a reasonable inference that his disability was a motivating factor in the adverse employment action. *Young*, 152 F.3d at 1023. But an inference of discrimination can arise "without additional evidence

where the overall strength of the prima facie case and the evidence of pretext 'suffice[s] to show intentional discrimination.' " *Rothmeier*, 85 F.3d at 1337.

Jelsma presented a strong prima facie case of discrimination under the *McDonnell Douglas* test. He also presented evidence that his shoulder impairment was the motivating factor in the City's decision to urge him to retire. The City does not dispute that its officials told Jelsma that the City could not continue to accommodate him because it needed someone who could perform all job duties without an accommodation. Because Jelsma has shown that pretext could have existed and that a motivating factor in the City's urging him to retire was his impairment, summary judgment is denied.

## II.    Age Discrimination in Employment Act

The Age Discrimination in Employment Act ("ADEA") prohibits employers from taking adverse employment actions against employees because of their age. 29 U.S.C. § 623(a)(1). The ADEA's purpose is "to promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). "Arbitrary age discrimination occurs when an employer denies or reduces benefits based *solely* on an employee's age." *Jankovitz v. Des Moines Indep. Cmty. Sch. Dist.*, 421 F.3d 649, 654 (8th Cir. 2005). The employee must show discrimination by either offering direct evidence or indirect evidence under the *McDonnell Douglas*

burden-shifting analysis. *King v. United States*, 553 F.3d 1156, 1161 (8th Cir. 2009).

### A.  Direct Evidence of ADEA Discrimination

Direct evidence "refers to the causal strength of the proof." *Richardson v. Sugg*, 448 F.3d 1046, 1058 (8th Cir. 2006). It "must be strong enough to show a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision." *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 965 (8th Cir. 2006) (citation omitted). Direct evidence must support an inference that a discriminatory attitude was more likely than not the motivating factor in the decision. *Id.*

Direct evidence usually includes conduct or statements by persons with decision-making responsibilities that can be viewed as directly reflecting the employer's discriminatory attitude. *Id.* at 966. Direct evidence does not include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993) (internal quotations omitted). Examples of direct evidence usually include statements connected to the employee's age and the job duty. *See, e.g.*, *E.E.O.C. v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 924-25 (8th Cir. 2002) (finding direct evidence of discrimination

when a supervisor told a bus driver that he "was too old to drive a bus");
*Kneibert v. Thomson Newspapers, Mich., Inc.*, 129 F.3d 444, 452 (8th Cir. 1997)
(finding that a decisionmaker's statement to a terminated editor that he "had
no use for a senior editor" and instead needed "three young editors" was direct
evidence of ADEA discrimination).

Jelsma argues that his supervisors had a plan to get him to retire. To
support his argument, Jelsma highlights records from meetings with O'Toole,
Janssen, and Anderson. Docket 28-1 at 21-22. But Jelsma never alleged that
any supervisor made a statement directly connected to his age; rather, the
statements centered around his inability to perform the work and that Jelsma's
retirement eligibility date was approaching.

"[F]actors other than age, but which may be correlative with age, do not
implicate the prohibited stereotype, and are thus not prohibited
considerations" in an employment decision. *Schiltz v. Burlington N. R.R.*, 115
F.3d 1407, 1412 (8th Cir. 1997) (citing *Hazen Paper Co. v. Biggins*, 507 U.S.
604, 611 (1993)). While mentioning that Jelsma's retirement date was
approaching is correlative with age, that does not prove that Jelsma's
supervisors found him unable to do his job because of his age. Discrimination
under the ADEA requires that the discrimination be based *solely* on age.
*Jankovitz*, 421 F.3d at 655. The supervisors' statements did not implicate the
prohibited stereotype because the statements were not solely based on his age.

**B.  Indirect Evidence of ADEA Discrimination**

An employee may also prove discrimination based on inferences and circumstantial evidence under the familiar *McDonnell Douglas* burden-shifting analysis, which applies to ADEA claims. *Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992). Under this analysis, an employee can establish a prima facie case of age discrimination by proving that the employee (1) was at least 40 years old; (2) suffered an adverse employment action; (3) was meeting the employer's reasonable expectations at the time of the adverse action; and (4) was replaced by someone substantially younger. *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1137 (8th Cir. 2006). If the employee makes the requisite prima facie showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Schlitz*, 115 F.3d at 1414. If the employer meets that showing, then the burden shifts back to the employee to show that the reason is mere pretext. *Id.*

Jelsma was 60 years old when he retired, so the first element is met. Under the second element, a constructive discharge can be considered an adverse employment action under the ADEA. *See, e.g., Tork v. St. Luke's Hosp.*, 181 F.3d 918, 919 (8th Cir. 1999) (discussing a constructive discharge claim under the ADEA). The third element is similar to the essential duties analysis in the ADA claim as discussed above and Jelsma has put forth sufficient evidence to meet this element.

Under element four, Jelsma argues that the City replaced him with Lyle Larson, a 32-year-old man. Docket 28-1 at 22. The City counters that after Jelsma retired, it evaluated Jelsma's position, a typical practice after an employee retires, and found that it did not need a building maintenance worker. Rather, the City found that it needed a mechanic and that the less specialized work could be performed by a custodian. It did not hire a new building maintenance worker. Docket 15-1 at 21.

Juries are allowed to question an employer's motive in restructuring its workforce in an ADEA claim. *See Christensen*, 481 F.3d at 1095-96. In *Christensen*, the employer, Titan, hired Quintak, Inc. to operate its warehouse and distribution center. *Id.* at 1090. The employee, Christensen, a 58-year-old male, worked for Quintak as a third-shift supervisor. *Id.* He took FMLA leave to have a knee replacement surgery. *Id.* While on leave, Titan terminated Quintak, hired its own employees, and repeatedly assured Christensen that he would have a job when he returned from leave. *Id.* After rearranging job duties and reducing its workforce, however, Titan decided not to hire Christensen back. *Id.* Rather, a 25-year-old employee took over Christensen's old job duties. *Id.* A jury found for Christensen on his ADEA claim. *Id.* at 1091. The Eighth Circuit upheld the jury verdict, reasoning that the younger employee continued to complete Christensen's job duties even though he did not become third-shift supervisor until the next year. *Id.* at 1095-96. The Eighth Circuit found that

this was sufficient evidence for a jury to determine that Titan committed age discrimination in not rehiring Christensen. *Id.* at 1096.

The City claims that it restructured various job duties after Jelsma resigned. After reassigning job duties, a younger employee, Lyle Larson, absorbed Jelsma's job duties, even though Larson did not assume Jelsma's job title. This factual scenario mirrors that in *Christensen*, where a younger employee absorbed an older employee's job duties without taking the older employee's specific job title. The trial court allowed Christensen to have a jury determine whether ADEA discrimination existed. Similarly, a jury should decide whether the City replaced Jelsma with Larson, even though Larson held a different job title than Jelsma did when he worked for the City. Viewing the facts in the light most favorable to Jelsma, he has made a prima facie showing of ADEA discrimination.

The burden now shifts to the City to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Schlitz*, 115 F.3d at 1414. The City argues that a nondiscriminatory action existed for its actions. After evaluating Jelsma's doctors' reports, the City determined that Jelsma could not perform his job and that the job modifications could not continue. Jelsma had told his supervisors that he needed shoulder surgery since 2002, but never had the surgery. The City contends that it did not need to wait indefinitely for Jelsma's shoulder situation to be corrected.

Jelsma must now show pretext and he can only avoid summary judgment if the evidence, in its entirety, "(1) created a fact issue as to whether the proffered reasons are pretextual *and* (2) created a reasonable inference that age was a determinative factor in the adverse employment decision." *Haas v. Kelly Serv., Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005) (citing *Rothmeier*, 85 F.3d at 1336-37). The same analysis for an ADA pretext argument can also apply to an ADEA pretext argument. *See Christensen*, 481 F.3d at 1096.

Under the first prong of the pretext test, Jelsma argues that the City ignored Dr. Luther's report that stated Jelsma could lift objects weighing twenty pounds or less with his left arm. Rather, the City unnecessarily placed more restrictive lifting restrictions on Jelsma. Further, as discussed in the ADA pretext argument above, City officials summarily dismissed Jelsma from qualifying for any open position with the City, even though he had relevant education and employment experience that might have qualified him for one of the other positions.

Under the second prong of the pretext test, Jelsma argues that the City's unwillingness to transfer him to another job raises a reasonable inference that his age was a determining factor in urging him to retire and threatening him with a loss of pension benefits if he refused to do so. Viewing the facts in the light most favorable to Jelsma, a material issue of genuine fact exists on whether the City's explanations for its actions were pretext for age

discrimination. Consequently, summary judgment on the ADEA claim is denied.

## III.  Family Medical Leave Act

### A.  Jelsma Was Entitled to Medical Leave

The FMLA provides that an eligible employee may take a total of twelve weeks of unpaid leave during any twelve-month period if "a serious health condition . . . makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 859 (8th Cir. 2000) (reasoning that the employee must meet both conditions). A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either inpatient care at a medical facility or continuing treatment by a health care provider. 29 U.S.C. §§ 2611(11)(A), (B). FMLA's regulations further require a period of incapacity of more than three consecutive days and  subsequent medical treatment to support a finding of a "serious health condition." Dep't of Labor, Continuing Treatment, 29 C.F.R. § 825.115(a) (2008). A subsequent treatment can be a single occasion that results in a regimen of continuing treatment under a health care provider's supervision. *Id.* at § 825.115(a)(2).

Congress intended the concept of a "serious health condition" to be construed broadly to effect FMLA's remedial purposes. *Stekloff*, 218 F.3d at 862. Disability under the ADA requires that the individual must be unable to

perform a broad range of jobs. *Id.* at 861. Contrastingly, under the FMLA, it is sufficient that the person cannot perform his job, even if that is the only job he cannot perform. *Id.*

An employee must also show that he is unable to perform the functions of his position. 29 U.S.C. § 2612(a)(1)(D). An employee fulfills this requirement when he cannot work or cannot perform any one of his position's essential functions within the meaning of the ADA. Dep't of Labor, Functions of the Position, 29 C.F.R. § 825.123(a) (2009). If an employee is absent from work to receive medical treatment for a serious medical condition, he is considered unable to perform the essential functions of his position during his absence. *Id.* The inquiry only focuses on the employee's current job with his current employer at the time of the FMLA absence. *Stekloff*, 218 F.3d at 862.

Jelsma has shown that he had a physical impairment due to his shoulder injury. He had a single operation that entailed physical therapy and continued supervision by his physician. Jelsma was unable to perform any of the essential duties of his job immediately after surgery. Thus, as a threshold matter, FMLA would allow Jelsma to take up to twelve weeks of unpaid leave.

Employees have two claims against employers under the FMLA, interference and retaliation. 29 U.S.C. §§ 2615(a)(1), (2). Interference occurs when an employer denies or interferes with an employee's FMLA rights. *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008). Retaliation occurs when the

30

employer discriminates against an employee for asserting his FMLA rights, because an employer may not consider an employee's use of FMLA leave as a negative factor in making an employment decision. *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). Jelsma has only alleged a retaliation claim.

## B.  Retaliation under the FMLA

### 1.  Prima Facie Case of Retaliation

An employee can prove FMLA retaliation with direct evidence or circumstantial evidence under the *McDonnell Douglas* burden-shifting analysis. *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006). Jelsma does not allege direct evidence, but rather presents indirect evidence. Under the *McDonnell Douglas* framework, the employee must make a three-part showing that: (1) he exercised rights afforded to him under the FMLA; (2) he suffered an adverse employment action; and (3) there was a causal connection between his exercise of rights and the adverse employment action. *Id.* If the employee meets this prima facie showing, the burden shifts to the employer to show that it had a legitimate, nondiscriminatory reason for its actions. *Id.* The burden then shifts back to the employee to show the employer's proffered reasons are mere pretext. *Id.*

On February 20, 2007, Jelsma informed his supervisors that he would be having surgery on his shoulder and would need FMLA leave. He also needed the leave to care for his ill mother. While Jelsma did not formally apply for

FMLA leave until April 10, 2007, his supervisors had notice in February of 2007 that he would be taking FMLA leave starting March 21, 2007. An employer must only have notice of an employee's need to take FMLA leave to trigger its duties under the FMLA. *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1036-37 (8th Cir. 2010) ("[T]he employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." (citing *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999))). Accordingly, Jelsma engaged in an FMLA protected activity when he first informed his supervisors on February 20, 2007, that he would need FMLA leave for his shoulder surgery and to care for his mother. Dep't of Labor, FMLA Rules, 29 C.F.R. §§ 825.112(a)(3), (4) (2009).

Constructive termination can be an adverse employment action in an employment discrimination case. *Ogden*, 214 F.3d at 1008 n.3. As stated above, a genuine issue of material fact exists on whether the City constructively discharged Jelsma.

To establish a link between Jelsma's exercise of his FMLA rights, a protected activity, and his constructive termination, he must show that the employer's " 'retaliatory motive played a part in the adverse employment action.' " *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 208-09 (2d

Cir. 1990)). If the evidence raises an inference of a retaliatory motive, that is sufficient. *Hite*, 446 F.3d at 866. The timing of the FMLA request and the adverse employment action can show a retaliatory motive, but is generally insufficient alone to establish a causal connection. *See Eliserio v. United Steelworkers of Am.*, 398 F.3d 1071, 1079 (8th Cir. 2005).

Discriminatory comments can establish a casual connection, especially if the supervisor who initiates the adverse employment action relies on those statements in making a decision. *See Hite*, 446 F.3d at 866 (discussing cases showing discriminatory comments sufficient to find a casual connection). Further, an escalating action can show a causal link. *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 503 (8th Cir. 2005). An escalating action occurs when the employer took escalating and retaliatory action after the employee engaged in the protected activity. *Id.*

On February 23, 2007, only three days after Jelsma engaged in a protected activity when he told his supervisors that he would be taking FMLA leave, one of Jelsma's supervisors, O'Toole, began pressuring him to retire. On February 27, 2007, two supervisors, Janssen and Anderson, encouraged Jelsma to retire. On March 5, 2007, Janssen told Jelsma that if he did not retire, Janssen could terminate his employment and Jelsma would lose his health and retirement benefits. Jelsma has alleged sufficient facts to show that a causal connection existed between the time he engaged in the protected

activity and the time that the City began pressuring him to retire. Accordingly, Jelsma has met his prima facie burden.

### 2. Nondiscriminatory Reasons and Pretext

The City argues that its nondiscriminatory reason for urging Jelsma to retire was that Jelsma's doctors told him that he would be unable to perform his job six months after the surgery. Jelsma argues that the City prospectively found that he would be unable to perform his job after surgery a month before his surgery even occurred.

An employee must be able to perform the essential functions of his job once he returns from FMLA leave. *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1031 (8th Cir. 2006); *see also Hatchett*, 251 F.3d at 677 ("The FMLA does not require an employer to allow an employee to stay in a position that the employee cannot perform."). FMLA's regulations state that " 'the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers under the [ADA].' " 29 C.F.R. § 825.702 (2009) (quoting S. Rep. No. 103-3, at 38 (1993)). The Eighth Circuit has cited this language in other cases involving FMLA and ADA claims. *See, e.g.*, *Hatchett*, 251 F.3d at 675.

In *Hatchett*, the employee was unable to perform the essential functions of her job under the ADA. *Id.* at 676. Because the employee could not perform the essential functions of her job with or without a reasonable accommodation

34

under the ADA, she was not entitled to FMLA leave. *Id.* at 676-77. The court reasoned that "[a]n employee is only entitled upon return from leave to that which she would have been entitled absent the leave time." *Id.* at 677 (citing the FMLA legislative history).

Under the FMLA, employees are allowed to take leave when "a serious health condition makes the employee unable to perform one or more of the essential functions of his or her job." 29 C.F.R. § 825.200(a) (2009). This regulation, by reference, incorporates the ADA definition of "essential functions." *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. App'x 488, 496 (6th Cir. 2008). As defined above, essential functions under the ADA include the fundamental job duties, not the marginal functions of the position. *Moritz*, 147 F.3d at 787.

The proof offered by the parties in this case is a note from Dr. Braman that initially found that Jelsma could have returned to work on light duty six weeks after surgery. But Dr. Braman also found that, six months after surgery, Jelsma could not perform all of his job duties. The note, however, is unclear as to exactly which job duties Jelsma could perform and whether they were fundamental job duties or marginal functions of the position. Further, unlike the employee in *Hatchett*, a material issue of genuine fact exists on whether Jelsma could perform his position's essential functions with a reasonable accommodation as provided in the ADA. Under the ADA, Jelsma was entitled to

a reasonable accommodation, and when he returned from FMLA leave, he would have still been entitled to a reasonable accommodation.

Congress designed the FMLA and ADA to dovetail together to protect American workers. *See, e.g.*, 29 C.F.R. §§ 825.702(c)(1)-(4) (2009). For example, the regulations provide that "[a]t the end of the FMLA leave entitlement an employer is required under FMLA to reinstate the employee in the same or an equivalent position, with equivalent pay and benefits, to that which the employee held when leave commenced." 29 C.F.R. § 825.702(c)(4). When Jelsma's FMLA leave commenced, he held the position of a building maintenance worker on light duty. After returning from FMLA leave, he was entitled to an equivalent position, a building maintenance worker on light duty, as long as those accommodations were not an undue hardship on the City. Jelsma has presented sufficient evidence to show that a genuine issue of material fact exists as to whether the City's proffered reasons that Jelsma could not perform the essential duties of his job were pretext for FMLA retaliation. Thus, summary judgment is denied on the FMLA claim.

## CONCLUSION

The City moved for summary judgment on Jelsma's ADA, ADEA, and FMLA claims. Jelsma resisted the motion on each claim and brought forward factual evidence and analysis to support his arguments. His evidence, combined with the deferential standard of review on a summary judgment

motion for employment discrimination, shows that genuine issues of material

fact exist for Jelsma's ADA, ADEA, and FMLA claims. Accordingly, it is

ORDERED that defendant's motion for summary judgment (Docket 14) is

denied.

Dated September 29, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE